## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CURTIS J. DEMPSEY, | ) | |
| | ) | No. 16 C 3397 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Maria Valdez |
| NANCY A. BERRYHILL, Acting | ) | |
| Commissioner of the U.S. Social | ) | |
| Security Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying Plaintiff Curtis Dempsey's ("Plaintiff") claims for Social Security Income ("SSI") under Title XVI of the Social Security Act (the "Act"). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Plaintiff's motion for summary judgment [Doc. No. 10] is denied and the Commissioner's cross-motion for summary judgment [Doc. No. 18] is granted.

## BACKGROUND

### I.     Procedural History

Plaintiff filed an application for SSI on October 24, 2011, alleging a disability onset date of September 23, 2010, due to lead poisoning, attention deficit disorder

---

[1]  Nancy A. Berryhill is substituted for her predecessor, Carolyn W. Colvin, pursuant to Federal Rule of Civil Procedure 25(d).

("ADD"), bronchitis, depression, and a stutter. (R. 180–85, 194.) His initial application was denied on December 19, 2011, and again at the reconsideration stage on April 27, 2012. (R. 75–76.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") on May 30, 2012. (R. 95–97.) The hearing was held on June 25, 2014. (R. 38–74.) Plaintiff appeared at the hearing with his non-attorney representative and offered testimony. (*Id.*) A vocational expert and medical expert also appeared and offered testimony. (*Id.*) On September 24, 2015, the ALJ issued an unfavorable written decision, finding Plaintiff is not disabled. (R. 14–37.) The Appeals Council ("AC") denied review on February 4, 2016, leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005); *Herron v. Shalala*, 19 F.3d 329, 332 (7th Cir. 1994); (R. 1–6).

## II.    Medical Evidence

Plaintiff was born on June 14, 1990 and was twenty-four years old at the time of his administrative hearing. (R. 180.) He completed one year of high school and has no prior work experience. (R. 46, 49.)

### A. Medical Records

Plaintiff's first examination of record is a Formal Mental Status Evaluation performed by Dr. Dennis Karmitis, Psy.D., on December 1, 2011, where Plaintiff reported that he suffered from ADD, sadness, and depression. (R. 255–58.) In order to formulate his assessment, Dr. Karamitis asked Plaintiff to answer several questions and perform mental exercises. (*Id.*) In general, Plaintiff was reluctant to

participate in the examination, and reported that he did not know his own marital status or the meaning of the words "job", "condo", and "hobby." (*Id.*) When asked, he was unable to name five large cities or correctly name the current President of the United States. (R. 257.)

Plaintiff stated that his daily activities typically consisted of sleeping, watching television, and looking out the window. (R. 256.) Plaintiff specifically noted that he did not cook or assist with household chores. (*Id.*) He explained that his mother often had to remind him to take care of his personal hygiene, and Dr. Karamitis noted that his grooming and hygiene were acceptable for the setting. (R. 256–57.) Dr. Karamitis stated that Plaintiff had no evidence of cognitive difficulties relative to his mental processing, and then diagnosed him with depressive mental disorder. (R. 258.)

Shortly after his examination with Dr. Karamitis, on December 15, 2011, Plaintiff's record was reviewed by Dr. Michele Womontree, Psy.D., a non-examining consultant. (R. 259–272.) Based in part on the findings of Dr. Karamitis, Dr. Womontree found that Plaintiff had the medically determinable impairment of depressive disorder which would result in mild difficulties in his ability to maintain both social functioning and concentration, persistence, or pace. (R. 262–69.)

About four months later, on April 16, 2012, Plaintiff presented for a second psychological examination, this time with Dr. Henry Fine, M.D. (R. 273–76.) Plaintiff reported that he had ADD, and went on to explain that his troubles in school were a result of lead poisoning as a child. (R. 273.) He also presented with

bronchitis. (R. 274.) In contrast to his examination with Dr. Karamitis, Plaintiff's attitude and degree of cooperative were good. (R. 273.) Plaintiff's speech was understandable with no obvious stuttering, and his grooming was neat. (R. 274.) At this examination, Plaintiff was able to name five large cities, and correctly reported that Obama was the President of the United States. (R. 275.) However, when asked how a bush and a tree are alike, Plaintiff stated "What is a bush." (*Id.*) Dr. Fine determined that Plaintiff suffered from a complex learning disability with ADHD symptoms, related to his lead poisoning and complicated by dysthymic disorder, as well as bronchitis. (R. 276.)

Eight days later, on April 24, 2012, Plaintiff was evaluated by Dr. Leon Jackson, Ph.D., a non-examining consultant. (R. 277–79.) In his evaluation, Dr. Jackson considered the April 2012 statements provided by Dr. Fine, but ultimately affirmed the opinion of Dr. Womontree due to the lack of severe findings or longitudinal history. (R. 278–79.)

On October 11, 2013, Plaintiff presented to Jenny Lemus, M.H.P., at Mount Sinai Hospital ("Mount Sinai"), after experiencing symptoms of depression and increased anger. (R. 287.) Plaintiff was asked to list his strengths and interests, to which he responded, in part, by stating that he liked to drive and cook. (R. 292.) Upon review, Ms. Lemus determined that Plaintiff had poor insight with current mental health needs. (*Id.*) Her findings were later signed by Catherine Ortiz, Psychotherapist, L.C.S.W., L.P.H.A. (R. 293.)

On December 4, 2013, Plaintiff returned for another evaluation at Mount Sinai, but was seen by Tracy McDonald, N.P., for problems sleeping, decreased appetite, and decreased energy. (R. 294.) He stated he often felt angry, was easily irritated, yelled, and "g[ot] into other people's faces." (*Id.*) His anger episodes typically lasted for one hour. (*Id.*) Ms. McDonald noted that Plaintiff was appropriately dressed and exhibited fair grooming and hygiene. (R. 295.) Plaintiff was noted to be independent at shopping, housekeeping, accounting, food preparation, and transportation; however, his independence in transportation was limited due to his panic and anxiety. (*Id.*) His thought processes were logical, goal oriented, and coherent. (*Id.*) Despite knowing that some of his behaviors were inappropriate, Ms. McDonald noted that Plaintiff did not seem motivated to change. (*Id.*)

In addition to the foregoing evidence, Plaintiff's record also contains a function report, completed by Plaintiff.[2] (R. 199–207.) In his report, Plaintiff explained that he relied on his mom to help remind him to bathe himself, cook his meals, perform housework, and take him outside one per month. (R. 200–202.) He explained that he does not spend time with others or get along with authority figures. (R. 203–05.) In a similar report, Plaintiff's sister indicated that he had also suffered from a stutter "all of his life." (R. 222.)

Plaintiff's record also contains two slips from Richard J. Daley College which indicate Plaintiff's achievement levels in math and reading as of August 2012. (R.

---

[2] Plaintiff's report was completed by Diane Jones on his behalf. (R. 206.)

235–36.) The scores reveal that he performed at a beginning fourth grade level in math and a late fifth grade level in reading. (*Id.*)

**B. Plaintiff's Testimony**

Plaintiff was present and testified at his June 2014 administrative hearing. He testified that he could not work because he struggles to stay focused, is easily distracted, and suffers from anger issues. (R. 61.)

In order to manage his anger, Plaintiff stated that that he attended monthly, one hour sessions with a psychologist. (R. 56–57.) As of the date of his hearing, he testified that he had met with his psychologist at least six times. (R. 57.)

At one point, Plaintiff had obtained a driver's license; however, he explained that he had subsequently misplaced it, and therefore no longer drove. (R. 48.)

For about one month, Plaintiff attended GED courses at a Richard J. Daley College, with his cousin, two to three times per week. (R. 58.) He stated that he did not feel confident commuting to school on his own and that he was generally uncomfortable using public transportation individually because he had gotten lost before. (R. 49, 59.)

He also explained that he did not cook. (R. 60–61.)

**C.        ME's Testimony**

Medical and psychological expert, Ellen Rozenfeld (the "ME") was also present and testified at Plaintiff's hearing. After review of the medical evidence of record, the ME opined that Plaintiff's record was consistent with a diagnosis of learning disorder (R. 64.) Although the ME did not have access to any IQ scores, she

based her finding on Plaintiff's records from Richard J. Daley College which indicated he was below his peers in reading and math abilities. (*Id.*) She stated the record likewise supported diagnoses of depressive disorder and dysthymic disorder. (R. 64–65.) She explained that with regards to the evidence of file, Plaintiff did not meet or equal any of the listings. (R. 65.)

She then assigned Plaintiff a moderate limitation in his activities of daily living, social functioning, and in concentration, persistence, or pace. (R. 66.)

She suggested Plaintiff was capable of performing tasks of simple, routine nature based on his history of cognitive issues and his lowered academic level. (R. 67.) She additionally stated he was capable of understanding simple, repetitive instructions and attending and concentrating sufficiently well to complete those types of tasks, but not detailed or complex tasks. (R. 67–68.) She further limited him to no sustained general public contact, incidental contact, occasional coworker contact, occasional supervisory contact, and to a work environment where changes are routine in nature. (R. 68.)

## III.  ALJ Decision

The ALJ found at step one that Plaintiff has not engaged in substantial gainful activity since his application date of October 24, 2011.  (R. 19.)  At step two, the ALJ concluded that Plaintiff has severe impairments of depression, ADD, history of learning disorder, and history of bronchitis.  (*Id.*)  The ALJ concluded at step three that his impairments, alone or in combination, do not meet or medically

equal a Listing. (R. 20.) The ALJ then determined that Plaintiff retained the
residual functional capacity ("RFC") to perform work at all exertional levels but he:

> [S]hould avoid concentrated exposure to pulmonary irritants like
> fumes, odors, dusts, gases, and poor ventilation; and he retains the
> capacity for routine, repetitive, and simple tasks involving constant
> ability to understand and remember very short and simple
> instructions; carry out very short and simple instructions; maintain
> attention and concentration for extended periods for the tasks stated;
> sustain an ordinary routine without special supervision; make simple
> work-related decisions and use judgment; complete a normal workday
> and workweek and to perform at a consistent pace without an
> unreasonable number and length of rest periods; and respond
> appropriately to routine changes in the work setting. [Plaintiff] also
> has occasional ability to work in coordination or proximity to others
> without being distracted by others; accept instructions and respond
> appropriately to criticism from supervisors; and to get along with
> coworkers or peers without distracting them or exhibiting behavioral
> extremes. Moreover, [Plaintiff] can rarely interact with the general
> public and is limited to incidental contact.

(R. 22–23.) At step four, the ALJ found that Plaintiff has no past relevant work. (R.
31.) At step five, based upon the testimony of a vocational expert, Plaintiff's age,
education, work experience, and RFC, the ALJ concluded that Plaintiff can perform
jobs existing in significant numbers in the national economy, leading to a finding
that he is not disabled under the Act.  (32–33.)

## DISCUSSION

### I.   ALJ LEGAL STANDARD

Under the Act, a person is disabled if he has an "inability to engage in any
substantial gainful activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)(4).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1–4. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II.    JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841; *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that the ALJ's decision must be affirmed even if "'reasonable minds could differ'" as long as "the decision is adequately supported.") (citation omitted).

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must at least minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis so that we can follow his reasoning . . . ."); *see Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the

Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron*, 19 F.3d at 333; *see Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence.").

## III. ANALYSIS

Plaintiff asserts that the ALJ committed four errors: (1) his RFC determination was unsupported by substantial evidence; (2) he improperly evaluated Plaintiff's subjective symptom allegations; (3) he mistakenly determined Plaintiff did not meet the criteria of any listing; and (4) he failed to properly develop the record before making an unfavorable disability finding. For the reasons set forth below, we find that the ALJ did not err in these regards.

## A. The ALJ's RFC finding is supported by substantial evidence

Plaintiff alleges that the ALJ's RFC determination is unsupported by substantial evidence, and therefore remandable, because the ALJ: (1) included boilerplate language in his decision; (2) cherry-picked facts; and (3) failed to properly weigh the medical opinions.

### 1. Boilerplate Language

Plaintiff's opening argument criticizes the ALJ for using boilerplate language to explain his RFC determination. The Seventh Circuit has found that the mere inclusion of boilerplate language does not automatically warrant remand decision if

the ALJ "otherwise points to information that justifies his . . . determination." *Pepper v. Colvin*, 712 F.3d 351, 368 (7th Cir. 2013). In part, the ALJ here stated: "the record does not contain any opinions from treating or examining physicians indicating that [Plaintiff] suffered limitations greater than those determined in this decision." (R. 30.) After employing this boilerplate language, the ALJ provided a detailed discussion of Plaintiff's consultative examinations with Drs. Karamitis and Fine, the testimony of both Plaintiff and the ME, and Plaintiff's two psychiatric evaluations from Mt. Sinai, explaining how each supported his RFC determination. The ALJ's references to this evidence sufficiently allow this Court to follow the ALJ's path of reasoning between the evidence and his RFC conclusions. *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (The ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning.") (citations and quotations omitted). Thus, the ALJ's use of boilerplate language is of no consequence in this case.

### 2. Cherry-picking

Next, Plaintiff complains that the ALJ "cherry-picked" the medical evidence by only discussing the statements that were favorable to his RFC determination. In particular, Plaintiff argues that the ALJ failed to discuss why his evidence of hindered concentration, recurring panic attacks, and poor judgment did not result in more restrictive RFC determination.

Contrary to Plaintiff's assertions, the ALJ explicitly discussed each of the limitations which Plaintiff complains he ignored. First, at step three, the ALJ acknowledged Plaintiff's testimony that he had trouble focusing, struggled to finish tasks, and did not follow written or spoken instructions. (R. 21.) Based on this evidence, he determined that Plaintiff would have moderate difficulties with regard to concentration, then accounted for those difficulties by restricting Plaintiff's RFC to short and simple tasks.

Next, at step four, the ALJ articulated his consideration of Plaintiff's records from Mount Sinai, where he reported that he often felt panicked in crowds. The ALJ also noted that the same appointment, it was reported Plaintiff had poor judgement. (R. 26–27.) Because the ALJ referenced all of the evidence Plaintiff suggests he ignored before he computed his RFC determination, Plaintiff's "cherry-picking" argument is without merit.

### 3. Weighing Opinion Evidence

Third, Plaintiff argues that the ALJ improperly weighed the medical opinions. (Pl.'s Br. at 11–13.) In his argument, Plaintiff vaguely takes issue with the ALJ's consideration of "the consultative and treating sources" without specifically identifying which opinions the ALJ overlooked. (Pl.'s Br. at 12.)

Under the regulations, a treating source is a "physician, psychologist, or other acceptable medical source" who has provided an applicant with medical treatment or evaluation, or has had an ongoing treating relationship with the applicant. 20 C.F.R. §§ 416.902; 404.927. Only acceptable medical sources can be

considered treating sources whose medical opinions may be entitled to controlling weight. 20 C.F.R. § 416.927(c).

There are only three sources in the record which Plaintiff could construe as treating sources—Jenny Lemus, M.H.P., Catherine Ortiz, L.C.S.W., L.P.H.A., and Tracy McDonald, N.P. (R. 287–97.) Any attempt by Plaintiff to argue that these three sources constituted "treating opinions" that the ALJ was under a duty to assign "controlling" weight is non-persuasive.

There is no indication in the record that Ms. Ortiz directly treated Plaintiff on any occasion, therefore it would be unreasonable to conclude that she had formed a treating relationship with him. But even if Ms. Ortiz had evaluated Plaintiff, her opinion would still not be entitled to controlling weight because social workers are not considered treating sources under the regulations. 20 C.F.R. § 416.902.

Likewise, Plaintiff's relationships with Ms. Lemus and Ms. McDonald do not qualify as treating physician relationships. While Plaintiff attempts to argue that his single presentation to each source was sufficient to establish the "ongoing treatment" necessary to constitute a treating physician relationship with each, the regulations make clear that a claimant must see a treating source with some "frequency." 20 C.F.R. § 416.927(a)(2). One presentation to a source simply cannot satisfy this requirement. Again, even if we were to accept Plaintiff's argument, it would ultimately fail, because therapists and nurse practioners, like Ms. Lemus and Ms. McDonald, are not considered treating sources under the regulations. 20 C.F.R.

§ 416.902. Accordingly, Plaintiff's argument that any of these three sources are entitled to the controlling weight reserved for treating physicians is meritless.

Plaintiff's likewise takes issue with the ALJ's treatment of the "consultative examiners," but neither identifies which examiners opinions the ALJ overlooked nor how their opinions would have changed the ALJ's RFC determination. (Pl.'s Br. at 12–13.) Because the ALJ accorded some weight to the findings of Drs. Womontree and Jackson, the only consultative examiners of record which remain are Drs. Karamitis and Fine.

Under the regulations, ALJs must evaluate every medical opinion in the record, regardless of its source. 20 C.F.R. § 404.1527(c). Here, the ALJ provided a comprehensive summary of the findings of both examining consultants, Drs. Karamitis and Fine; however he failed to assign specific weight to their opinions, in direct contradiction to the requirements of the regulations. Although the ALJ's failure to comply with the regulations was an error, we need not remand this case to the ALJ, "if it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). We can confidently make that prediction here.

A claimant's RFC "is the most [he] can still do despite [his] limitations. *See* 20 C.F.R. § 404.1545(a)(1). When determining a claimant's RFC, an ALJ need only incorporate those limitations which he finds are supported by the record. *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). In this case, Dr. Karamitis and Dr. Fine

made several statements and observations about Plaintiff's daily activities, mental functioning, and diagnoses, but neither offered an opinion about whether Plaintiff's impairments would result in work-related limitations. As a result, there is no reasonable likelihood that an ALJ's re-examination of these two opinions would change the RFC determination. Therefore any error the ALJ committed with regard to these opinions is harmless.

## B.     The ALJ Properly Evaluated Plaintiff's Subjective Symptom Allegations

An ALJ's credibility determination is granted substantial deference by a reviewing Court unless it is "patently wrong," and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Jen v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003). The ALJ must give specific reasons for discrediting a claimant's testimony, and "[t]hose reasons must be supported by record evidence and must be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003) (quoting *Zurawski*, 245 F.3d at 887–88). The lack of objective evidence is not by itself reason to find a claimant's testimony to be incredible. *See Schmidt v. Barnhart*, 395 F.3d 737, 746–47 (7th Cir. 2005).

Plaintiff argues that the ALJ improperly determined that his lack of emergency treatment and inpatient care rendered him incredible. (Pl.'s Br. at 13.) While, an ALJ may not draw a negative inference about a claimant's failure to seek medical treatment without first exploring his reasons for that failure, SSR 16-3p,

2016 WL 1119029, at *8, "[n]ot all of the ALJ's reasons must be valid as long as *enough* of them are." *Halsell v. Astrue*, 357 Fed. Appx 717, 722–723 (7th Cir. 2009) (emphasis in original). Although the ALJ here failed to consider reasons for Plaintiff's lack of treatment, he provided several other explanations for his negative credibility determination.

First, the ALJ determined Plaintiff could not be given credit due to his inconsistent allegations regarding his ability to drive, cook, and speak without stuttering. (R. 29.) As an example, the ALJ noted that Plaintiff testified that he had misplaced his driver's license and could not take public transit alone because he would get lost, yet his records from Mount Sinai reflected that one of his strengths was that he liked to drive. Similarly, Plaintiff reported that could not and did not prepare meals, but another one of his self-reported strengths was cooking. Moreover, Plaintiff and his family members claimed that he stuttered, but the ALJ pointed out that his speech was noted to be clear and understandable at his consultative examinations.

Next, the ALJ explained that Plaintiff's "lack of cooperation and effort" during his consultative examinations "certainly [did] not bolster his credibility or persuasiveness." (R. 28.) While the ALJ recognized that Plaintiff's records supported limited academic abilities and cognitive issues, he found that Plaintiff, incredibly, claimed not to know what a job was, did not understand what it meant to be married, and claimed to not know what a condo, bush, or hobby were. Moreover, the ALJ noted that Plaintiff was unable to name five large cities or

correctly identify the current President at his consultation with Dr. Karamitis in December 2011; yet, at his second examination four and half months later with Dr. Fine, he correctly listed five cities and stated that Obama was the current President. Based on this evidence, the ALJ determined that Plaintiff had likely engaged in symptom magnification and therefore was likely not credible.

Finally, the ALJ highlighted that the record contained little objective evidence to support Plaintiff's subjective allegations, which also negatively impacted his credibility. (R. 23–31.) With regard to the opinion evidence, the ALJ noted that at Plaintiff's earliest examination, Dr. Karamitis determined that he had no apparent cognitive difficulties. (R. 25.) Additionally, Plaintiff's records from Mount Sinai from 2013 revealed that he was cooperative, attentive, and intact at both examinations. Moreover, Plaintiff testified that he had visited a psychologist on at least six occasions, yet the record lacked documentation of any mental health counseling or therapy. (R. 28.)

Because the ALJ provided several reasons other than Plaintiff's lack of emergency treatment for discounting his subjective symptom allegations, there exists a reasonable basis upon which his credibility determination can rest. Accordingly, we uphold his determination.

## C.     Plaintiff Failed to Demonstrate that the ALJ Erred at Step Three.

Third, Plaintiff alleges that the ALJ committed reversible error where he determined that Plaintiff's severe impairments did not meet or equal in severity

Listing 12.02 (Organic Mental Disorders), Listing 12.04 (Affective Disorders), and Listing 12.08 (Personality Disorders).[3]

At step three, an ALJ must consider whether a claimant's impairments meet or medically equal a listed impairment, either singly or in combination. 20 C.F.R. § 405.1520(a)(4)(iii). Although an ALJ should provide a step-three analysis, a claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a Listing. *Knox v. Astrue*, 327 Fed. Appx. 652, 655 (7th Cir. 2009); *Sullivan v. Zebley*, 493 U.S. 521, 531, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). In order to meet the required level of severity for Listings 12.02, 12.04, and 12.08, a claimant must satisfy the "paragraph B" criteria. To satisfy the "paragraph B" criteria, a claimant's mental impairments must result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.[4] 20 C.F.R. § 404.1520a(c)(3); *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). A marked limitation means more than moderate but less than extreme. 20 C.F.R. 404, Subpt. P, App. 1, § 12.00. Plaintiff asserts that he meets the "paragraph

---

[3] The SSA recently revised its criteria in the Listing of Impairments ("listings") used to evaluate claims involving mental disorders. *Revised Medical Criteria for Evaluating Mental Disorders*, 81 Fed. Reg. 66138, 66138–78 (Sept. 26, 2016) (to be codified at 20 C.F.R. Pts. 404 and 416), available at https://www.gpo.gov/fdsys/pkg/FR-2016-09-26/pdf/2016-22908.pdf. Because these rules apply to claims filed on or after January 17, 2017, all references to the listings in this opinion refer to the prior version.

[4] Repeated episodes of decompensation, each of an extended duration, means three episodes within one year, or an average of once every four months, each lasting for at least two weeks. Plaintiff does not argue that he satisfies the "paragraph B" criteria due to episodes of decompensation. Accordingly, the Court does not address episodes of decompensation in this opinion.

B" criteria because "treating mental health professionals found that [he] had poor cognitive processes with interruptions by panic attacks." (Pl.'s Br. at 8.)

The ALJ fully address the "paragraph B" criteria before determining that the Plaintiff did not fulfill its requirements. (R. 20–22.) Specifically, the ALJ found that Plaintiff had no more than moderate restrictions in his activities of daily living, social functioning, and concentration, persistence, or pace, and no episodes of decompensation.

In activities of daily living, the ALJ found Plaintiff would have a moderate restriction because he needed reminders about personal care activities, although his hygiene was found to be appropriate at all but one of his consultative examinations, did not cook or perform household chores, and rarely left his home, yet his was independent at shopping, housekeeping, accounting, food preparation, and transportation—albeit, limited by his panic and anxiety.

Similarly, the ALJ found that Plaintiff had a moderate restriction in social functioning. Although Plaintiff alleged that the did not spend time with others, only travelled with his mother, and did not get along with authority figures, his record also indicated that he took GED classes two to three days per week for one month, had a cooperative attitude at his examinations, and that his anger typically only lasted for one hour.

Finally, the ALJ determined that Plaintiff would have moderate difficulties in concentration, persistence, and pace. Plaintiff alleged that he had trouble staying focused, finishing tasks, and following instruction. However, Plaintiff's consultative

examinations showed he did not have any apparent cognitive defects relative to his mental processing, his recall improved by the second examination, and that his attention and concentration were intact. Furthermore, by 2013 his thought processes were logical, goal oriented, and coherent.

"It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). Here, Plaintiff does not and cannot, point to a medical opinion which states that he meets or medically equals a listing. Nor does he highlight any evidence which the ALJ did not consider in his "paragraph B" discussion. His allegations amount to nothing more than a request that we reweigh the evidence in his favor. *See Clifford*, 227 F.3d at 869 ("In our substantial evidence determination, we review the entire administrative record, but do not reweigh evidence . . .") (citations omitted). Accordingly, Plaintiff has failed to demonstrate that met or equaled the criteria of any listed impairment either individually or in combination.

## D.     The ALJ was not Under a Duty to Further Develop the Record

Finally, Plaintiff argues that the ALJ violated his duty to fully and fairly develop the record because he did not order additional cognitive testing. (Pl.'s Br. at 14.)

ALJs have a duty to fully and fairly develop the record; however, the "obligation is not limitless." *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014) (quotation omitted). The Seventh Circuit "generally upholds the reasoned judgment

of the Commissioner on how much evidence to gather, even when the claimant lacks representation." *Nelms v. Astrue*, 553 F.3d. 1093, 1098 (7th Cir. 2009). "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Nelms*, 553 F.3d at 1098, quoting *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994).

Here, Plaintiff complains that the ME testified that the record did not contain IQ testing. This complaint mischaracterizes the ME's statement. In response the ALJ's question of whether there was sufficient evidence to assess whether Plaintiff had medically determinable impairments, the ME explained that although the record did not contain IQ scores, Plaintiff's math and reading achievement levels were sufficient to establish a learning disorder. The ME then proceeded to testify regarding Plaintiff's other diagnoses, the listings, and Plaintiff's functional abilities, and at no point indicated that the record was deficient.

Additionally, Plaintiff is mistaken insofar as he argues that the ALJ did not rely or refer to the opinions of Plaintiff's treating physicians or consultative examiners. The ALJ accorded significant weight to the findings of the ME and some weight to the findings of Drs. Womontree and Jackson. It is clear that the ALJ supported his findings with the evidence of record, and Plaintiff's conjecture that the ALJ might have obtained more evidence is insufficient to warrant remand. *See Nelms*, 553 F.3d at 1098.

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment is denied and the Commissioner's cross-motion for summary judgment [Doc. No. 18] is granted. Affirmed.

**SO ORDERED.**

**ENTERED:**

DATE:  <u>September 19, 2017</u>

**HON. MARIA VALDEZ**
**United States Magistrate Judge**